# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 30, 2014 Session

## In re JADEN W.

### Appeal from the Juvenile Court for Washington County
### No. J14348      Robert G. Lincoln, Judge



### No. E2014-00388-COA-R3-PT-FILED-DECEMBER 26, 2014

This is a termination of parental rights case brought by the Tennessee Department of Children's Services. The trial court terminated the parental rights of both parents on the grounds of severe child abuse and wanton disregard for the welfare of the child. Parents appeal. There is clear and convincing evidence to support the grounds of wanton disregard with respect to both parents and severe child abuse with regard to the father. However, we do not find that there is clear and convincing evidence to support the ground of severe child abuse with regard to the mother. There is clear and convincing evidence that termination of both parents' rights is in the child's best interest. We reverse in part, affirm in part, and remand.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial court is Reversed in Part, Affirmed in Part, and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J. joined.

Charles G. Currier, Knoxville, Tennessee, for the appellants, Joe W. and Charlotte W.

Robert E. Cooper, Jr., Attorney General and Reporter; Alexander S. Rieger, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services

Michelle Lee Caggiano, Elizabethton, Tennessee, Guardian Ad Litem.

1

**OPINION**

**I. BACKGROUND**

The minor child at issue, Jaden W.,[1] was born in December of 2012 to Joe W. ("Father") and Charlotte W. ("Mother," and together with Father, "Parents"). The Tennessee Department of Children's Services ("DCS") first became involved in this case following an incident that occurred on August 15, 2013. That morning, Mother woke up and fed Jaden before going to work. Father then fed Jaden again, approximately three hours later, around 10:30 AM. Father allegedly took a nap after feeding Jaden, and woke up around noon to change Jaden's diaper and discovered at that time that Jaden was pale and unresponsive, and his leg was "twisted." Father contacted his wife to tell her something was wrong with Jaden, and she immediately contacted emergency medical services. An ambulance arrived at Parents' home shortly after Mother's call, and emergency medical personnel transported Jaden to Johnson City Medical Center ("JCMC"). Despite the severity of Jaden's condition at the time of transport, Father elected to not ride in the ambulance with his eight-month-old son to the hospital. Instead, he waited at home for his wife to arrive from work and drive him to the hospital.

The EMTs intubated Jaden during transport. Jaden presented at JCMC with bruising on his head, legs, and buttocks. Doctors at JCMC discovered a subdural hematoma on the left side of Jaden's head and decided that he would need to be monitored by a pediatric neurosurgeon. Jaden was then transported by air to the University of Tennessee Medical Center ("UTMC") so that he could undergo further treatment for his injuries. After Jaden was transported to UTMC, medical professionals discovered retinal hemorrhaging in both of Jaden's eyes and fractures in his left leg.

The Washington County Sheriff's Office and DCS personnel interviewed Parents at JCMC. Due to the severity of Jaden's injuries, the DCS investigator asked Parents to sign an Immediate Protection Agreement, which prohibited the Parents from having contact with Jaden for 48 hours. Parents voluntarily signed the agreement. On August 27, 2013, the Washington County Juvenile Court issued an emergency protective custody order placing Jaden in temporary state custody. Parents were arrested on charges of aggravated child abuse and neglect on September 11, 2013, and they have since been released on bail.

DCS filed a petition to terminate the Parents' parental rights on September 25, 2013. As grounds for its petition, DCS averred both severe child abuse pursuant to

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

Tennessee Code Annotated Sections 36-1-113(g)(4) and 37-1-102(b)(23), and wanton disregard pursuant to Tennessee Code Annotated Sections 36-1-113(g)(1), 36-1-102(1)(A)(iv), -102(1)(C), -102(1)(E). The petition was heard by the Washington County Juvenile Court on December 3-6, 2013. At the trial, DCS presented testimony from medical experts, DCS employees, the Washington County Sheriff Office's criminal investigator, and an employee from Mother's former place of employment. In addition to their own testimony, Parents' evidence included the testimony of Mother's parents, Father's mother, and Parents' medical expert. The trial court entered its order on February 18, 2014 terminating Parents' parental rights on the grounds of severe child abuse and abandonment by wanton disregard. The trial court also found, by clear and convincing evidence, that termination was in Jaden's best interest. Parents appeal.

## II. ISSUES

Parents raise several issues for review, which we consolidate and restate as follows:

1. Whether the trial court erred in entering a "no contact" order that prohibited visitation between the parents and the child?
2. Whether the trial court erred in finding that Mother severely abused Jaden?
3. Whether the trial court erred in finding that Mother exhibited a wanton disregard for Jaden's welfare?
4. Whether the trial court erred in finding that Father severely abused Jaden?
5. Whether the trial court erred in finding that Father exhibited a wanton disregard for Jaden's welfare?
6. Whether the trial court erred in finding that DCS provided reasonable efforts to assist Parents in remedying the issues that led to the removal of the child from their home?
7. Whether the trial court erred in determining that it was in the best interest of the child for Parents' parental rights to be terminated?

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois,* 405 U.S. 645 (1972); *In re Drinnon,* 776 S.W.2d 96, 97 (Tenn. Ct. App.1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.,* 140 S.W.3d 643, 652–53 (Tenn. Ct. App.2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby,* 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36–1–113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family

3

ties.'" **M.L.B. v. S.L.J.**, 519 U.S. 102, 119 (1996) (quoting **Santosky v. Kramer**, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See* **Blair v. Badenhope**, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. **In re Drinnon**, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [ ] of the child.

Tenn. Code Ann. § 36–1–113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." **In re Valentine**, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. **In re C.W.W.**, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by* **In re Audrey S.**, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. **In re C.W.W.**, 37 S.W .3d at 474; **In re M.W.A., Jr.**, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. **State v. Demarr**, No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. **In re Valentine**, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); **In re J.J.C.**, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. **In re A.D.A.**, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); **Ray v. Ray**, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); **In re C.W.W.**, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this Court in reviewing cases involving the termination of parental rights:

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See **In re Adoption of A.M.H.**,* 215 S.W.3d [793,] 809 [(Tenn.2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. ***State Dep't of Children's Servs. v. Mims**,* 285 S.W.3d [435,] 447–48 [(Tenn. Ct. App. 2008)]; ***In re Giorgianna H.**,* 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); ***In re S.M.**,* 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App.2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. ***In re Angela E.**,* 303 S.W.3d [240,] 246 [(Tenn.2010)]; ***In re Adoption of A.M.H.**,* 215 S.W.3d at 809.

***In re Bernard T**.,* 319 S.W.3d 586, 596–97 (Tenn. 2010).


## IV. NO CONTACT ORDER

We first address Appellants' issue concerning whether it was proper for the trial court to enter a "no contact order" during these proceedings. In their brief, Appellants cite the law governing this issue; however, they failed to make any argument regarding how that law relates to the particular facts of this case. It is well settled that an appellate brief must contain an argument for each of the issues presented. *See* Tenn. R. App. P. 27. In other words, "an issue is waived where it is simply raised without any argument regarding its merits." ***Bean v. Bean***, 40 S.W.3d 52 (Tenn. Ct. App. 2000). In that Appellants made no attempt to actually argue this issue in their brief, the issue is waived.


## V. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

### A. Mother's Failure to Protect the Child

Appellants first assert that the trial court erred when it found that Mother committed severe child abuse when she failed to protect Jaden. Specifically, Appellants contend that the trial court's determination was not based on any scientific proof. In support of this argument, Appellants rely on the dissenting opinion in the United States Supreme Court case, ***Cavazos v. Smith***, -- U.S. --, 132 S. Ct. 2 (2011). As correctly noted by the guardian *ad litem*, this Court has determined that the dissent in ***Cavazos*** is inapplicable in a termination of parental rights case. *See **In re Travion B.***, No. E2012-01673-COA-R3-PT, 2013 WL

4461903, at *6 (Tenn. Ct. App. Aug. 19, 2013) (noting that the **Cavazos** dissent "undertake[s] a review of developments in medical research in the context of criminal law"). Aside from **Cavazos**, Appellants have cited no authority, nor have we found any cases in our research that support Appellants' argument on this point. Accordingly, we will review the trial court's finding of severe child abuse on the part of Mother against the record.

The trial court held that there was "clear and convincing evidence that [Mother] perpetrated severe child abuse on the minor child by knowingly failing to protect a child from. . . abuse or neglect that is likely to cause serious bodily injury or death." The trial court also held that Mother "knowingly failed to protect the child from conduct that, in the opinion of qualified experts, has caused or will be reasonably expected to produce…severe developmental delay or intellectual disability."

Tennessee Code Annotated Section 37-1-102(b)(23)(A)(i) defines severe child abuse, in pertinent part, as "the knowing exposure of a child to or *the knowing failure to protect a child from* abuse…that is likely to cause serious bodily injury or death." **Id**. (emphasis added). Severe bodily injury "includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, [and] injuries to the skin that involve severe bruising." Tenn. Code Ann. § 39-15-402(d). Tennessee Code Annotated Section 37-1-102(b)(23)(B) defines severe child abuse, in pertinent part, as, "the knowing failure to protect a child from such conduct" as "brutality, abuse or neglect [constituting severe child abuse as defined in this section]. . . ." In this regard, "a parent who has not directly abused [their] own child may still be found to have committed severe child abuse if [they] 'knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse.'" **In re H.L.F.**, 297 S.W.3d 223, 235 (Tenn. Ct. App. 2009) (quoting **In re R.C.P.**, No. M2003-01143-COA-R3-PT, 2004 WL 1567122 (Tenn. Ct. App. July 13, 2004)). The terms "'[k]nowing' and 'knowingly' are not defined in Tenn. Code Ann. § 37-1-102, or in any other statute pertaining to dependency and neglect proceedings to terminate parental rights or in other civil proceedings involving juveniles." **Id**. at 236 (footnotes omitted). Although "the words 'knowing' and 'knowingly' do not have fixed or uniform meanings, and their meanings vary depending on the context in which they are used or the character of the conduct at issue," **In re R.C.P.**, 2004 WL 1567122 at *7, this Court has explained that the "knowing" requirement

> is not limited to parents who are present when severe abuse actually occurs. A parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe

child abuse had occurred or that it was highly probable that severe child abuse would occur.

*In re H.L.F.,* 297 S.W.3d at 236 (quoting *In re R.C.P.,* 2004 WL 1567122 at \*7). In other words, "a parent's conduct is 'knowing, and a parent acts or fails to act "knowingly," when … she has actual knowledge of the relevant facts and circumstances or when … she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to … her." *Id.* (quoting *In re R.C.P.* 2004 WL 1567122, at \*7.)

With the foregoing definition in mind, we turn to the record.  At the termination hearing, DCS called Lois Campbell, an assistant manager at Mother's former place of employment.  Ms. Campbell testified that she had known Mother since roughly May 2012, and that she had witnessed Mother coming to work with bruises on her body.  Ms. Campbell testified she first noticed these bruises when Mother was pregnant.  When Ms. Campbell asked Mother about the bruising, Mother explained that she and Father had been in an argument, and that it wasn't the first time their arguments had become physical.  Ms. Campbell testified that, on another occasion, Mother came to work with a swollen nose and lip, and that Mother told Ms. Campbell that Father had "punched her in the face multiple times."  Ms. Campbell further testified that Mother left work that same day on her lunch break because she was concerned that Father would harm himself or Jaden.

Contrary to Ms. Campbell's testimony, Mother denied that she had been the victim of abuse by Father.  She testified that the only bruise Father ever caused was during an argument in which he grabbed her too hard by the arm.  Mother did admit that Father had told her of his previous domestic abuse arrest, and Father confirmed during his testimony that he had told Mother about his past domestic violence. During his testimony, Father also confirmed that he had been arrested in the past for domestic abuse for an incident involving his ex-wife.  Although he admitted that the incident with his ex-wife involved him "head butting" her, he denied ever punching Mother as testified by Ms. Campbell.

DCS argues that Father's admissions to Mother about his previous arrests for domestic abuse should have made Mother aware of his potential for violence.  Ms. Campbell's testimony further provides support that Mother should have had knowledge of Father's violent tendencies.  We cannot, however, charge Mother with knowledge that Father would harm their child simply because he was violent towards her and his ex-wife.  There is no evidence in the record indicating that Father has ever exhibited violence towards a child prior to the August 15th incident with Jaden.

We also cannot charge Mother with knowledge of Jaden's injuries prior to this incident because there is no evidence in the record to suggest that there were signs

of any injuries to Jaden before his admission to JCMC on August 15th. The court heard expert testimony from Dr. Marianne Neal, a pediatric radiologist who consults at UTMC. Dr. Neal testified that X-Ray scans revealed fractures in one of Jaden's legs. Dr. Neal testified that the fractures in Jaden's leg were no more than a week old and that they could have occurred at the same time he received his other injuries that led to his admission to JCMC. While there is some proof in the record that Jaden possibly exhibited an injury prior to the August 15th incident and that Father was violent towards Mother, this proof does not satisfy the heightened standard of proof of clear and convincing evidence, which we must apply in termination of parental rights cases. We, therefore, reverse the trial court's holding that Mother committed severe child abuse by failing to protect Jaden from the August 15th incident involving the Father.

### B. Mother's Abandonment of Child by Wanton Disregard

The Appellants also contend that there is not clear and convincing evidence to support termination of their parental rights on the ground of abandonment by wanton disregard. Although Appellants' brief raises this issue jointly with respect to both parents, we review the termination of their rights individually. We note that Appellants' brief is woefully inadequate on this issue with respect to both Father and Mother. Specifically, the brief does not comply with Tennessee Rule of Appellate Procedure 27(7), because it lacks any argument on this issue.[2] Tennessee Rule of Appellate Procedure 2 allows this Court to suspend the requirements of the Rules of Appellate Procedure "for good cause." This Court has previously stated that "there are times when this Court, in the discretion afforded it under Tenn. R. App. P. 2, may waive the briefing requirements to adjudicate the issues on the merits. This is especially true in cases involving domestic relations where the interests of children are involved." ***Chiozza v. Chiozza***, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009). Because of the sensitive nature of this case, and the fact that it involves a child, we will exercise our discretion to overlook the lack of briefing on this issue so that we may adjudicate it on the merits. We caution Appellants' attorney that suspension of the rules is not our usual course.

Termination of parental rights may be predicated upon "abandonment by the parent or guardian." Tenn. Code Ann. § 36-1-113(g)(1). Abandonment, for

---

[2] Tenneessee Rule of Appellate Procedure 27(7) requires an appellant's brief to contain "argument, which may be preceded by a summary of argument, setting forth: (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and (B) for each issue, a concise statement of the applicable standard of review." Appellants' brief, while citing copious amounts of law, fails to offer any relevant argument with respect to this issue, and thus fails to comply with the requirements of the rule.

purposes of terminating parental rights, is defined at Tennessee Code Annotated Section 36-1-102(1)(A)(iv), in pertinent part, as when "a parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and … the parent … has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." In this case, the trial court concluded that DCS proved, by clear and convincing evidence, that Mother had abandoned Jaden by wanton disregard.

In prior cases addressing this ground for termination, wanton disregard has been defined as criminal behavior, substance abuse, and failure to visit the child. *See In re Audrey S.*, 182 S.W.3d at 867-68. The record does not reveal any evidence that Mother has a history of criminal behavior or incarceration prior to this incident. However, this is not the only definition of wanton disregard. In **State, Dep't of Children's Servs. v. Harville**, No. E2008-00475-COA-R3-PT, 2009 WL 961782 (Tenn. Ct. App. Apr. 9, 2009), this Court affirmed the trial court's finding that termination for wanton disregard was predicated "on a laundry list of examples of Mother's exceptionally poor judgment and bad acts." *Id.* at *7. This Court has continued to use this alternate definition. *See **State, Dept. of Children's Services v. Hood**, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009). We further note that a parents' incarceration

> serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d at 866.

In examining Jaden's situation prior to his parents' incarceration, we note that the trial court found that, according to expert witnesses, Parents "subjected the child to medical neglect." The trial court also found that, according to expert witnesses, Parents "subjected the child to nutritional neglect." Dr. Mary Palmer, who practices in the areas of child abuse and emergency pediatrics, testified as an expert for DCS. Dr. Palmer first examined Jaden on August 16, 2013. She testified that Jaden's development was "poor" when he was admitted to the hospital on August 15th. She testified that "he was growing between the fifth and tenth percentile up until about two months of age and then on his four-month checkup had fallen below what we call the growth curve." Dr. Palmer explained that "parameters of the growth curve … gives you between two percent and 95 percent, and he was substantially below the two percent for his age." Dr. Palmer further testified that "in the terms of that age … [Jaden's weight] was [at] a substantial difference to where you would expect him to be." Dr. Palmer also noted that Jaden's pediatrician expressed concern to Parents about Jaden's weight and had requested that Parents bring Jaden back to the office for a "recheck"

appointment. However, Parents missed that appointment. Dr. Palmer testified that Jaden's weight was cause for concern. Dr. Palmer reported that, since Jaden has been in the care of his foster parents, Jaden is "gaining weight nicely" and is in the fifth percentile of growth.

Sarah Powell, an investigator with DCS, became involved in Jaden's case after he was admitted to JCMC. Ms. Powell testified that Jaden "was behind on his growth according to medical records." Ms. Powell also testified that Jaden's pediatrician had expressed concern about Jaden's weight, but that the Parents never followed up with an appointment to monitor Jaden's weight. The record contains a letter from the pediatrician's office to Parents that confirms they missed their appointment to follow up on Jaden's low weight.

Susan Horton, Jaden's DCS case worker, also expressed concern regarding Jaden's nutritional health if he were to return to the Parents' care. She testified that Parents were not meeting Jaden's physical needs while he was in their care. She described Jaden's physical health, including his nutrition, as extremely poor before he entered the hospital. Since his removal from his Parents' care, Ms. Horton testified Jaden's health has greatly improved.

The evidence in the record does not preponderate against the findings of the trial court on this issue. The trial court heard testimony, that it found "very credible," that Jaden's growth was below the minimum for his age. In addition to the concern expressed by Jaden's pediatrician, the DCS case worker also expressed concern about Jaden's growth and nutrition, noting that it was extremely poor at the time he entered into DCS's custody. Taken as a whole, the testimony presents clear and convincing evidence to support the trial court's conclusion that Jaden was medically and nutritionally neglected.

This refusal to show concern for Jaden's physical health, specifically his nutritional health, exhibits, as the trial court found, "a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." The evidence of Parents' role in Jaden's poor growth is further evidenced by the fact that, after being placed in foster care, Jaden has begun growing at a normal rate and appears much healthier. We conclude that there is clear and convincing evidence of Parents' refusal or neglect to properly care for Jaden's physical needs, or to address those needs even after being made aware of the problem. As such, the evidence suggests a pattern of conduct prior to Mother's arrest that renders her unfit as a parent. Accordingly, we affirm the trial court's conclusion that Mother abandoned Jaden by wanton disregard pursuant to Tennessee Code Annotated Section 36-1-102(1)(A)(iv).

### C. Father's Perpetration of Severe Child Abuse

Appellants assert that the trial court erred when it concluded that Father perpetrated severe child abuse. Like their argument with regard to Mother, Appellants again assert that the trial court erred when it found that Father committed severe child abuse against Jaden because the court's determination was allegedly not based on any scientific proof. Again, Appellants rely upon the dissent in *Cavazos* to support their argument that the medical evidence presented in the trial court concerning Father's abuse of Jaden is suspect and should not be considered by this Court. For the reasons discussed earlier, we again conclude that Appellants' argument concerning the medical proof is unpersuasive. Accordingly, we will review the trial court's finding concerning Father's abuse of Jaden against the record.

A court may terminate the parental rights of a parent if they have committed severe child abuse. *See* Tenn. Code Ann. § 36-1-113(g)(4). The trial court held that Father had committed severe child under two different definitions. The first definition is under Tennessee Code Annotated Section 37-1-102(b)(23)(A)(i), which defines "severe child abuse," in pertinent part, as "the knowing exposure of a child to or the knowing failure to protect a child from abuse…that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death."

> In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including, but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver.

*In re S.J. et al.,* 387 S.W.3d 576, 592 (Tenn. Ct. App. 2012). Tennessee Code Annotated Section 39-15-402(d) states that the term "serious bodily injury" "includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, [and] injuries to the skin that involve severe bruising."

Here, the trial court concluded that there was
> clear and convincing evidence that [Father] perpetrated severe child abuse on [Jaden] by knowingly exposing the minor child to abuse or neglect that is likely to cause seriously bodily injury or death, and because he knowingly used force on the minor child that was likely to cause serious bodily injury or death.

Parents both testified that Jaden was in the sole care of Father after Mother left for work at approximately 7:20 AM on the day Jaden was taken to the hospital. Mother also testified that when she left home, Jaden was in his portable crib and

that he was "fine." Father testified that Jaden was never removed from his portable crib during the five hours between Mother's departure and when she contacted emergency services. Clearly, Jaden was in Father's sole care from 7:20 AM until paramedics arrived. Accordingly, the evidence suggests only one conclusion: that Jaden's injuries occurred while he was in Father's care.

The record contains the testimony of three medical experts, along with several volumes of medical records, detailing Jaden's injuries. The first expert, Dr. Mary Palmer, who practices in the areas of child abuse and emergency pediatrics and is board certified in pediatrics, pediatric emergency medicine and child abuse pediatrics, testified she first examined Jaden on August 16, 2013. Dr. Palmer noted that there was bruising on his head when he arrived at UTMC. Dr. Palmer reviewed the results of a CT scan performed at UTMC, and discovered that Jaden had a subdural hematoma. She described this injury as "fluid below the dura, which is part of the lining of the brain, as well as signs of injury mostly to the left side of the brain with swelling on that side." Dr. Palmer explained that the cause of such an injury could be two-fold. "[o]ne is direct trauma where. . . hitting on those blood vessels will cause them to break. The other is through shaking." According to Dr. Palmer's testimony, when a child is shaken, this action can "stretch those. . . briding veins and break them open, and blood will collect then in that space." Dr. Palmer also noted that Jaden had suffered retinal hemorrhages. Such hemorrhages, she stated, are

> classically and typically, through our understanding of how they happen, believe[d] to happen through a shaking mechanism. . . . So putting those two pieces together, I think the predominant mechanism for injury for Jaden would be shaking, but the large focus of injury to the left side of the brain would make me concerned that there was also an element of direct trauma.

Dr. Palmer explained that, by the term "direct trauma," she meant "hitting where the head itself is banged." Dr. Palmer explained that the fact that Jaden's injuries were localized on the left side of his head provided further evidence of direct trauma.

While at UTMC, Jaden underwent several X-ray scans. Dr. Palmer reported that these scans showed that Jaden's right femur and tibia were fractured. She opined that these particular types of fractures could not have been caused by an accident. Dr. Palmer testified that the cause of the fractures would have been some kind of "twisting mechanism." Dr. Palmer also stated that as a result of his head injuries, Jaden suffered seizures while at UTMC. Importantly, Dr. Palmer testified that Jaden's injuries were of the type that could have caused death or permanent injury. She explained that the trauma to Jaden's head resulted in swelling that actually

12

shifted his brain to the right. Dr. Palmer stated that the injuries could not have been self-inflicted or caused by Jaden's half siblings. Dr. Palmer unequivocally testified "these are non-accidental injuries."

Dr. Marrianne Rhodes Neal testified by deposition on behalf of DCS. Dr. Neal was qualified as an expert in the field of pediatric radiology. Dr. Neal's testimony corroborated Dr. Palmer's testimony that Jaden had suffered a subdural hematoma and fractures to his right leg. Like Dr. Palmer, Dr. Neal opined that Jaden's injuries were "non-accidental." The trial court specifically found that the testimony of both Dr. Palmer and Dr. Neal were "very credible." "[A]ppellate courts will not-reevaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *Wells v. Tenn. Bd. Of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).

Appellants presented their own expert, Dr. Ronald Wright, who was qualified as an expert in forensic pathology. Unlike Drs. Palmer and Neal, Dr. Wright did not give any indication as to how Jaden could have appeared "fine," (as Mother stated in her testimony, *supra*), but then deteriorate so rapidly in a few hours. Although Dr. Wright testified that Jaden's injuries could possibly have been caused by something other than abuse, the trial court specifically found Dr. Wright's testimony was "not helpful." As noted above, appellate courts give deference to a trial court's credibility determinations. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

This Court has held that in cases, such as the instant appeal, where the victim cannot yet speak, and where there are no witnesses and the caregiver denies causing the injury, a court must glean whether abuse was committed "knowingly" from the circumstances. *In re S.J. et al.*, 387 S.W.3d 576, 591 (Tenn. Ct. App. 2012). Here, as discussed above, the record establishes that Jaden was in the sole care of Father when he was injured. Although both Parents offered testimony claiming that Jaden's injuries must have been accidental, the trial court found the Parents' credibility "flawed, lacking and deficient in truthfulness." The trial court also found their testimony "unbelievable at best, unconvincing oftentimes, and not credible." In light of the credibility findings made by the trial court, and considering the record as a whole, we conclude that there is clear and convincing evidence to support the trial court's conclusion that Father committed severe child abuse under Tennessee Code Annotated Section 37-1-102(b)(21)(A)(i).

The trial court also found, by clear and convincing evidence, that Father committed severe child abuse as defined at Tennessee Code Annotated Section 37-1-102(b)(23)(B). Tennessee Code Annotated Section 37-1-102(b)(23)(B) defines "severe child abuse," in relevant part, as

13

[s]pecific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment…

Dr. Palmer opined that Jaden was a victim of severe child abuse under the definition set out at Tennessee Code Annotated Section 37-1-102(b). In fact, both Drs. Palmer and Neal testified that Jaden's injuries would result in developmental delays. In addition, Susan Horton, Jaden's DCS case worker, whom the court qualified as an expert witness in social work, testified that Jaden attends at least one doctor's appointment a week in order to make sure that he does not suffer further complications from his injuries. She also testified that due to his injuries, Jaden cannot hear out of one ear; in addition, at the time of trial, Jaden was undergoing tests to determine whether his injuries will impair his vision. From the foregoing testimony, which is largely undisputed, we conclude that there is clear and convincing evidence to support the trial court's finding that Father committed severe child abuse as defined at Tennessee Code Annotated Section 37-1-102(b)(23)(B).

### B. Father's Abandonment of Child by Wanton Disregard

Termination of parental rights may be predicated upon "abandonment by the parent or guardian." Tenn. Code Ann. Section 36-1-113(g)(1). Abandonment, for purposes of terminating parental rights, is defined at Tennessee Code Annotated Section 36-1-102(1)(A)(iv), in pertinent part, as when "a parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and … the parent … has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." "This Court has held that parental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration." *Hood*, 338 S.W.3d at 925.

Although "wanton disregard" is not statutorily defined, this Court has held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard." *In re Audrey S.*, 182 S.W.3d at 867-68.

> [T]he parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the

parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d at 866.

In its order terminating parental rights, the trial court found that "there is abuse of controlled substances in the [Parents'] home." The trial court found that "[a]lthough [Father] is a patient at the Veteran's Administration Hospital in Johnson City, Tennessee, he goes to a pain clinic in Kingsport, Tennessee to procure large amounts of Loritab [sic] and [d]iazepam." The trial court further found that Father was taking five pain pills a day, and that Father was going to the pain clinic because the Veteran's Administration Hospital would not prescribe him Lortab and diazepam. The trial court also found that Father was paying for his pain medications, even though he could receive alternative medications free from the Veteran's Administration Hospital. Father has been obtaining pain and anxiety medications in this manner for the past six years.

When questioned by the trial court, Father admitted to the above findings. Father testified that he receives both Lortab and diazepam from a Dr. Tochev in Kingsport. Father testified that he received medication free at the VA Hospital, but that he thought the VA did not prescribed Lortab or diazepam. Accordingly, Father pays to receive medication from Dr. Tochev. Father testified that he continues to purchase 150 Lortab pills per month, despite being unemployed.

Although Father obtains his medication from a doctor, he is prescribed a large number of pills, and had to "doctor shop" in order to obtain this medication. Substance abuse does not require the use of illegal drugs. The evidence in the record does not preponderate against the trial court's findings of fact with regard to Father's prescription medication use. Considering the evidence of Father's prescription use as a whole, there is clear and convincing evidence that Father abused prescription medication in the four months prior to Father's arrest. Substance abuse alone may constitute wanton disregard for a child's welfare. *In re Audrey S.*, 182 S.W.3d at 867-68. We affirm the trial court's holding on this ground as to Father.

Substance abuse, however, is not the only factual ground for a finding of wanton disregard. As discussed above in regard to the ground of abandonment by wanton disregard by Mother, there is clear and convincing evidence that Jaden was nutritionally and medically neglected, as shown by the testimony of experts in the record. Father, as the primary caregiver while Mother was at work, is at least equally as culpable as Mother in regard to the nutritional and medical neglect that Jaden suffered. Incorporating our discussion of Jaden's medical and nutritional neglect above, we conclude that there is clear and convincing to support the trial court's holding that Father abandoned Jaden by wanton disregard.

15

## VI. Reasonable Efforts

Appellants present several challenges to the trial court's finding that DCS made reasonable efforts to reunite them with Jaden. Appellants first argue that the lack of a permanency plan in the record is fatal to a termination of parental rights. They also contend that DCS could not have made reasonable efforts because of the short length of time between when Jaden was removed from their home and when their parental rights were terminated. Finally, Appellants assert that DCS's efforts in and of themselves were not reasonable. We address each of these arguments in turn.

The statutory duty to make reasonable efforts includes an obligation to exercise "'reasonable care and diligence ... to provide services related to meeting the needs of the child and the family.'" *In re R.L.F.*, 278 S.W.3d at 316 (emphasis omitted) (quoting Tenn. Code Ann. § 37-1-166(g)(1)). Courts evaluate the reasonableness of the Department's efforts in consideration of the following factors:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d 148, 158–59 (Tenn. Ct. App. 2007) (footnote omitted) (citing *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)). Courts should decide the reasonableness of the Department's efforts "on a case-by-case basis in light of the unique facts of the case." *In re Bernard T.*, 319 S.W.3d 586, 601 (Tenn. 2010) (citing *In re J.C.D.*, 254 S.W.3d 432, 446 (Tenn. Ct. App. 2007)). The burden is on the Department to prove clearly and convincingly the reasonableness of its efforts. *In re R.L.F.*, 278 S.W.3d at 316 (citing *In re B.B.*, No. M2003–01234–COA–R3–PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004)). "Reunification of a family, however, is a two-way street, and neither law nor policy requires [DCS] to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B.*, 228 S.W.3d at 159. "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody. They must also make reasonable

efforts to rehabilitate themselves once services have been made available to them." *Id.*

Appellants first assert that DCS's failure to file a permanency plan and an affidavit of reasonable efforts with the trial court is fatal to the termination proceeding because such an affidavit is statutorily required under Tennessee Code Annotated Section 37-1-166(c). This Court, however, has previously held that such failure is not fatal to the proceeding if, at trial, DCS presents "specific, sufficient evidence to establish the reasonableness of its efforts." *In re Arteria H.*, 326 S.W.3d 167, 179 (Tenn. Ct. App. 2010) (citing *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *8 (Tenn. Ct. App. March 9, 2004)). Such evidence must specifically identify "the services required in the permanency plan, the services actually provided to the parents, and the outcomes of these services." *In re C.M.M.*, 2004 WL 438326 at *8. As detailed below, the record contains evidence regarding the requirements of the permanency plan, the services provided to Parents, and the outcomes of those services. Accordingly, there is "evidence specifically identifying" the services and outcomes as required by *In re C.M.M.*.

Appellants next argue that the short length of time between when DCS first became involved in the case and when it filed the petition to terminate illustrates DCS's failure at reasonable efforts in this case. Appellants cite no authority in their brief that require DCS to wait a certain amount of time before initiating termination proceedings, nor does our research reveal such authority. Accordingly, we look to the particular facts presented here. Although the period for providing reasonable efforts may have been truncated, in light of the severity of Jaden's injuries and the life-threatening situation he faced in Parents' home, we cannot conclude that DCS failed to act in accordance with the circumstances in moving for termination as early as they did in this case.

Finally, Appellants challenge the reasonableness of DCS's efforts to reunite them with their son. Appellants characterize the efforts to reunite the family as a "sham" and argue that there was not clear and convincing evidence to sustain a finding of reasonable efforts. The trial court found that there was clear and convincing evidence of DCS's reasonable efforts to reunite the family. Upon examination of the record, we affirm the trial court's findings regarding DCS's efforts.

Susan Horton, Jaden's assigned DCS case worker, testified that the permanency plan required the Parents to "have safe and stable housing, maintain legal employment," undergo a "mental health assessment and follow any and all recommendations," and complete "anger management, marriage counseling, and nutritional counseling." Ms. Horton further testified that DCS provided Parents with a potential list of employers; referred Parents to mental health services, anger

management, marriage counseling, and nutritional counseling; and scheduled appointments for these services.

At the time of trial, Parents had not, with one exception, completed any of the classes required by the permanency plan. Neither parent had obtained employment, and Mother testified that she had not been actively seeking employment. The Parents also have not obtained safe and stable housing. They continue to reside in Father's parents' home, despite his father having been convicted of carnal knowledge of a child. The parents could have complied with the requirement of obtaining a safe and stable home by returning to their own home, yet they refused to move back to their home to satisfy the requirements of the permanency plan.

Based upon this record, we conclude that there is clear and convincing evidence that DCS made reasonable efforts to reunite the Parents with Jaden. Despite such efforts by DCS, Parents have failed to complete the goals outlined in the permanency plan. Accordingly, we affirm the trial court on this issue.

## VII. Best Interest of the Child

Appellants assert that the trial court erred when it found that termination was in Jaden's best interest. Appellants have supplied this Court with a copious amount of law on this point, but have made no argument regarding the child's best interest except to state that Parents' parental rights should not be terminated because they love Jaden. As with previous issues, despite the brief's inadequacy, we review for error on the merits in consideration of the sensitive nature of this case.

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interest." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Accordingly, before a court in this State can terminate a biological parent's parental rights, it must find that doing so is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2). In determining whether termination of parental rights is in a child's best interest, the lower court must consider the following factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of

time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36–1–113(i). The foregoing list of factors is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *Hood*, 338 S.W.3d at 929 (citing *State v. T.S.W.*, No. M2001–01735–COA–R3–JV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002)).

19

The trial court provided extensive findings of fact in its February 18, 2014 Order Terminating Parental Rights. Therein, the court examined all nine best interest factors in relation to Jaden's case and concluded that they all applied. The trial court held that it was in Jaden's best interest that the Appellants' parental rights be terminated. For brevity's sake, we do not recite every finding the trial court made with respect to Jaden's best interest; however, we do recite a portion of the court's findings with regard to each factor.

In regard to the first factor, the trial court found that the Appellants "have not made changes in their conduct or circumstances that would make it safe for the child to go home. They refuse to accept any form of responsibility for the injuries which they perpetrated upon the minor child." The trial court also found that Parents "remain unable to meet the minor child's needs" and that they could not "demonstrate that there has been a meaningful change such that they will now be protective of the child." The trial court also found that Parents "refuse to acknowledge their documented history of domestic violence, such that physical abuse remains a concern in the home."

Concerning the third best interest factor, the trial court found that Parents have been unable to maintain visitation with Jaden because they are under a No Contact Order. This factor is directly related to the fourth factor. The trial court found that "[i]n the opinion of qualified experts, the minor child has not suffered any emotional trauma by being separated from [Parents]." The court also noted that "[i]n the opinion of qualified experts, he will not experience any adverse developmental setbacks by not being reunified with his parents," further finding that "[b]efore the minor child came into DCS custody, both parents delegated much of their parental obligations for the minor child to their two (2), ten (10) year old children who also lived in the home."

In addressing what effect a change in current caretakers would have on Jaden, the trial court found that changing Jaden's current caretakers "would be detrimental." The court explained that "Jaden is thriving in his current foster placement. He is in the top five (5) percent of his growth chart." The trial court also found that Jaden's current placement is meeting all of his medical needs and appointments. The court also found that "[i]n the opinion of qualified experts, since being placed into DCS custody, his condition has greatly improved."

In regard to the sixth factor, the trial court found that Parents "have abused or neglected the minor child by perpetrating severe child abuse upon him and/or knowingly failing to protect him from the same." The trial court noted the type and extent of Jaden's injuries resulting from the abuse, and also concluded that those injuries would result in long-term developmental delays. Further, the trial court found that Father

has neglected two (2) half-siblings of the minor child. [Father] has two (2) other daughters which he abandoned in Germany twelve (12) years ago. He has not supported these children. He cannot remember the last time he sent them a gift or card. He has not visited with these children in (12) years. He is not sure whether he legally divorced their mother.

In regards to the seventh factor, the trial court found that the Appellants are facing criminal charges for their actions in this case, and that they currently reside with someone who has been convicted of sodomy and carnal knowledge of a child. The trial court also found that "there is abuse of controlled substances in the [Parents'] home" based upon Father's testimony.

Finally, in regard to the ninth factor, the trial court found that Parents

are able-bodied and capable of working and paying support for the minor child. Both Respondents are without full-time gainful employment at this time to support either themselves or the minor child. [Father] receives two hundred and sixty dollars ($260.00) per month in disability benefits. Out of these funds, he pays forty-five dollars ($45.00) per month for his [Lortab] and Diazepam from his pain clinic. Both parents have performed odd jobs to earn money for themselves, but have not contributed to [Jaden's] support out of those funds.

The trial court went on to note that "in the opinion of the minor child's social worker, who was qualified as an expert in the field, it is in the best interest of the minor child for the parental rights of the Respondents to be terminated." The trial court concluded that "DCS has proven, by clear and convincing evidence, that it is in the best interest of the minor child for the parental rights of the [Appellants'] to be terminated."

The record establishes that Jaden's injuries occurred while he was in the sole care of Father. Testimony revealed that Father was the only person with Jaden during the five hours before he became unresponsive and was taken to the hospital. Dr. Mary Palmer testified that Jaden's injuries were the result of shaking, and that there was also an "element of direct trauma." Dr. Palmer described the injuries as "non-accidental" and concluded that Jaden had been a victim of severe abuse. Dr. Marianne Neal's testimony confirmed Dr. Palmer's opinions. This testimony supports the trial court's application of the sixth factor concerning physical violence or brutality towards the child.

21

We also note that the Appellants' explanations for Jaden's injuries, i.e., that either Jaden injured himself either through crawling or by falling off of a couch, was not accepted by the trial court, because Parents' explanations were in direct contravention of the testimony of Dr. Palmer and Dr. Neal, who the court found "very credible." This Court has reviewed the myriad volumes of medical records that indicate Jaden's injuries were inflicted rather than accidental. We conclude, as did the trial court, that his injuries constitute serious bodily injury within the meaning of the statutory definition. The evidence does not preponderate against the finding of the trial court on this factor, and it clearly and convincingly supports the trial court's finding that it is in Jaden's best interest not to remain in Parents' care where he is subjected to abuse.

There are also other concerns in this case. Parents reside with an individual who has been convicted of sodomy and carnal knowledge of a child. The trial court found that "[i]n the opinion of qualified experts, their housing is currently unsafe for [Jaden because] one of the individuals residing there having a criminal record of carnal knowledge of a child."[3] This does not present a safe and stable environment for Jaden. Jaden's case worker, Susan Horton, has expressed "grave concern" about Parents' living arrangement. There is no indication in the record that they needed to move, but rather they chose to move because they did not want to be in what they characterized as an empty house after DCS removed Jaden and their other children from their custody. This refusal to change their circumstances in order to create a safe home environment for Jaden has a direct bearing on the first best interest factor.

Another indication that Mother, in particular, refuses to make a change of circumstances in order to regain custody is that she insists on continuing to live with Father. While the Court acknowledges the difficult situation abuse victims face when deciding to leave their abusers, what troubles this Court is that Mother unequivocally denies that Father ever abused her or Jaden. She is steadfast in her conviction that Father did not cause the grave injuries to Jaden even in the face of the extensive medical testimony presented at the hearing that Jaden's injuries were inflicted rather than accidental. This unwillingness to recognize the cause of injury to Jaden makes it clear that Mother will not protect Jaden in the future.

Father's use of prescription medication also presents a problem. By his own testimony, Father takes five pain medications per day. As discussed above, the trial court found that there is substance abuse in the Parents' household. Father places a priority on obtaining certain pain medications when he could receive free medicine from the VA hospital. Therefore, leaving Jaden in the care of Father,

---

[3] Jaden's paternal grandfather has been convicted of this crime.

who abuses pain medication and exhibits a wanton disregard for Jaden's welfare, is certainly not in the child's best interest.

Jaden's health has vastly improved since he entered foster care. As noted earlier, Jaden's parents were not feeding him appropriately, and he was not receiving proper nutrition. The Parents also failed to follow up with Jaden's pediatrician after the pediatrician expressed concern about Jaden's weight and growth. Susan Horton testified that Jaden's foster family ensures that Jaden attends all of his medical appointments. As a result of his injuries, the foster family transports Jaden to at least one medical appointment each week. In contrast, Parents have demonstrated in the past that they are either unwilling or unable to meet Jaden's medical needs.

From the record, it is clear that Jaden's family is not able to provide a safe environment for him. Parents have not taken steps to provide safe housing for him, and concerns about physical abuse in the home have not been addressed or even acknowledged. Testimony also revealed that Father has a history of domestic violence, including two arrests. While in Father's care, Jaden suffered serious physical trauma that will likely lead to developmental disabilities. Even before the August 15th incident, Jaden was malnourished and underweight. Jaden is now receiving proper care and is much safer in his foster environment than with his Parents. As such, the evidence does not preponderate against the findings of the trial court with regard to best interest factors. Accordingly, we conclude there is clear and convincing evidence in the record to support the trial court's decision that termination of Appellants' parental rights is in Jaden's best interest.

## Conclusion

For the foregoing reasons, we reverse the order of the trial court with regard to the termination of Mother's parental rights on the ground of severe child abuse, affirm the order of the trial court terminating Father's parental rights on the ground of severe child abuse, and affirm the order of the trial court terminating both Parents' parental rights on the ground of wanton disregard. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of this appeal are assessed against Appellants, Joe W. and Charlotte W., and their surety.

_____
KENNY ARMSTRONG, JUDGE